UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA        CASE NO. 18-cr-00302-01

VERSUS        JUDGE SUMMERHAYS

DORIAN ARNELL FERGUSON (01)        MAGISTRATE JUDGE HANNA

## <u>REPORT AND RECOMMENDATION</u>

Currently pending is the Motion to Suppress [Rec. Doc. 32], which was filed by the defendant, Dorian Arnell Ferguson. The Government filed a response in opposition [Rec. Doc. 37], to which the defendant replied [Rec. Doc. 38]. The motion was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court.

An evidentiary hearing was held on April 12, 2019. Testifying for the Government were Lafayette City Police Officers, Cpl. Jeremy Dupuis and Cpl. Kenderis Handy. No witnesses testified for the defendant. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motion be DENIED.

## **Factual Background**

This case arises out of an incident occurring between the defendant and certain law enforcement officers on July 13, 2018. Because the instant motion centers around a claim of mistaken identification stemming from a separate investigation, the factual background begins with the investigation which led to the relevant incident. On the basis of the evidence adduced at the hearing, considered with the undisputed facts of record, this Court makes the following findings of fact.

On July 9, 2018, law enforcement officers with the Lafayette Police Department began investigating an attempted murder which occurred during the early morning hours on that same date. On the following day, an arrest warrant was issued for Markele Thibeaux, who was described in the supporting affidavit drafted by Lafayette City Police Detective Adam Lefort as a "black male in his 20's with a light complexion and short braided hair."[1] Pursuant to that warrant, Cpl. Jeremy Dupuis, who was assigned to the United States Marshals Violent Offenders Task Force, created a Wanted Poster, which included two photographs of Thibeaux as well as Thibeaux's age and identifying features.[2] Ferguson describes himself as as a thirty-nine-year-old "dark skinned black male with a shaved head."[3]

---

[1] Rec. Doc. 45-3, Deft. Ex. 5, p. 1.
[2] Rec. Doc. 44-1, Gov't. Ex. 1.
[3] Rec. Doc. 32-1, p. 2.

2

Two photographs were introduced by the Government depicting Ferguson and Thibeaux taken within a week of each other, July 13, 2018 and July 20, 2018, respectively.[4]  The photographs depict a difference in height of 2 inches, a difference in weight of 7 pounds, and both men had similar facial features, jawlines and complexions. The primary difference between them is Ferguson has a shaved head with facial hair while Thibeaux has hair and was more clean shaven at the time. However, Thibeaux is not clean shaven in the Wanted Poster.[5]

On July 13, 2018, at approximately 10:05 a.m., multiple law enforcement personnel assigned to the United States Marshals Violent Offender Task Force, Lafayette Police Department's Special Investigations Unit, and the Lafayette City Marshal's Unit, conducted a surveillance operation at 314 N. Bienville Street in Lafayette, Louisiana to identify and capture Thibeaux.[6] Cpl. Dupuis had researched Thibeaux and discovered that in the recent past officers had arrested Thibeaux and three other individuals, one of whom had provided an address of 314 N. Bienville Street.[7] Cpl. Dupuis also located multiple other addresses linked to Thibeaux within an approximately two to three mile radius of 314 N. Bienville.[8]  In addition, 314 N. Bienville Street is less than one mile from an address on Voorhies Street, which was

---

[4] Rec. Doc. 44-2, Gov't Ex. 2.
[5] Rec. Doc. 44-1, Gov't Ex. 1.
[6] Rec. Doc. 37, pp. 2-3.
[7] Rec. Doc. 46, p. 13.
[8] Id.

an address known by law enforcement to be frequented by Thibeaux as it belonged to his grandfather.[9] It is undisputed that Ferguson had no ownership or possessory interest in the property located at 314 N. Bienville Street.[10] It is further undisputed that Ferguson does not know Thibeaux.

During the surveillance operation, Cpl. Dupuis was driving down Angelloz Street when he passed in front of the garage for the 314 North Bienville Street address and observed four males, one of whom he believed to be Thibeaux, standing under the garage.[11] The time when Cpl. Dupuis had a complete unobstructed view of the garage, which had a car parked under it, was about three seconds.[12] The garage faces Angelloz Street, has no doors or side walls, is adjacent to, but detached from, the rear of the house except for a ramp connecting the two structures, and the area underneath the roof can be clearly seen from the street.[13] The yard is fenced with a gate in the driveway which was open at the time.[14] Cpl. Dupuis described the individual he believed to be Thibeaux as wearing a white shirt and black pants.[15] He further testified that the individual he observed was similar in skin tone, height,

---

[9] Rec. Doc. 46, p. 14.
[10] Rec. Doc. 37, p. 3 n.4.
[11] Rec. Doc. 46, pp. 14, 35.
[12] Rec. Doc. 46, pp. 27, 37-38, 48.
[13] Rec. Doc. 45-17-21, Deft. Ex. 9-G through 9-K.
[14] Rec. Doc. 45-18. Deft. Ex. 9-H.
[15] Rec. Doc. 46, p. 20.

weight, jawline and nose as Thibeaux.[16] This testimony is consistent with the depictions of Thibeaux and Ferguson in the photographs admitted as Gov't. Ex. 2.[17]

Upon observing and ostensibly identifying the individual as Thibeaux, Cpl. Dupuis contacted other officers with the Lafayette Police Special Investigations Unit and the Lafayette City Marshal to assist with the arrest and waited in his unmarked police unit until their arrival.[18] Once they arrived, the officers set out a perimeter in an attempt to contain the individual believed to be Thibeaux to the confines of the residence and surrounding area.[19] All assisting officers at the scene were either in uniform or police tactical vests clearly marked on the front and back as police and easily identifiable as law enforcement officers.[20]

Upon exiting his unmarked unit, which was positioned in the middle of the street directly in front of the garage on Angelloz where Cpl Dupuis was using it for cover along with a marked patrol car of the Lafayette City Marshal positioned nose-to nose with his unit, Cpl. Dupuis gave the command, "Police, place your hands into the air."[21] As soon as he identified himself as the police and gave the command, Cpl. Dupuis observed a black male, later identified as Ferguson, wearing a white shirt and black pants, fleeing on foot from the garage area where Cpl. Dupuis had last

---

[16] Rec. Doc. 46, p. 16.
[17] Rec. Doc. 44-2.
[18] Rec. Doc. 46, pp. 16-19.
[19] Rec. Doc. 46, p. 19.
[20] Rec. Doc. 46, pp. 20-21.
[21] Rec. Doc. 46, pp. 20, 38-39.

observed the individual he believed to be Thibeaux.[22] Cpl. Dupuis immediately got on the radio to advise the team on the perimeter that the subject, whom he did not identify as Thibeaux, was running, a description of what he was wearing and the direction of travel.[23] According to Ferguson, he fled upon seeing "armed men streaming toward the garage," because he was "a neighborhood barber [] known to carry cash and had been the victim of armed robberies on two recent occasions[.]"[24]

Cpl. Dupuis and a Deputy City Marshal commanded the two compliant males to exit the garage and walk toward the officers on the perimeter in the street.[25] At that time, Cpl. Dupuis realized that there had only been three males under the garage at the time that he had arrived, instead of four as he had initially believed, one of whom he believed to be Thibeaux.[26] The two compliant males were identified and determined not to be Thibeaux. Later, Cpl. Dupuis obtained permission from the resident at 314 N. Bienville Street to conduct a search of the residence which revealed neither contraband nor Thibeaux to be present in the residence.[27]

---

[22] Rec. Doc. 46, pp. 21, 40.

[23] Rec. Doc. 46, p. 21.

[24] Rec. Doc. 32-1, p. 3. Ferguson also claims that he "was in possession of a handgun in response to his recent robberies." *Id*.

[25] Rec. Doc. 46, pp. 21-22.

[26] Rec. Doc. 46, p. 21. The Government notes that "there were additional persons located within the residence of 314 N. Bienville Street, and the garage area is accessible from the residence." Rec. Doc. 37, p. 4 n.5. However, Ferguson points out that Thibeaux was not found inside the residence, nor was there any evidence he had ever been there, and none of the occupants resembled Thibeaux's physical appearance. Rec. Doc. 32-1, p. 4.

[27] Rec. Doc. 46, pp. 21-22.

Meanwhile, Lafayette Police Cpl. Kenderis Handy, who, along with other officers, had established a perimeter around the area, was positioned at the intersection of N. Bienville and Morse Street – one block south of the 314 address.[28] After learning from radio transmission that an individual was fleeing the scene, Cpl. Handy moved along North Bienville toward the 314 address where he observed a black male with a bald head and muscle shirt, later identified to be Ferguson, fleeing from the rear of the residence.[29] Cpl. Handy further observed Ferguson jump a fence and was proceeding to jump a second fence, before he was startled by a pit bull and changed his course.[30] At some point Cpl. Handy observed Ferguson jump a second fence, although it is not clear when, throw his right arm forward as if he was throwing an unknown object, followed by a "thumping noise," which Cpl. Handy believed to be the sound of something having been thrown against a vehicle parked nearby.[31]

Cpl. Handy lost sight of Ferguson but shortly thereafter, on the opposite side of the yard from Handy's position, Ferguson was taken into custody by two other officers where he was handcuffed and patted down for officer safety.[32] Cpl. Handy

---

[28] Rec. Doc. 46, pp.54, 58-60; Rec. Doc. 45-5, Deft. Ex. 6B.

[29] Rec. Doc. 46, pp. 54, 59-61, 70-71; Rec. Doc. 45-9, Deft. Ex. 8B. See also Rec. Docs. 45-13-16, Deft. Ex. 9C-9F.

[30] Rec. Doc. 46, pp. 54-55, 61-64, 71-72; Rec. Doc. 45-9, Deft. Ex. 8B. See also Rec. Docs. 45-13-16, Deft. Ex. 9C-9F.

[31] Rec. Doc. 46, pp. 55-56, 64-66, 71-72; Rec. Doc. 45-9, Deft. Ex. 8B. See also Rec. Docs. 45-13-16, Def. Ex. 9C-9F.

[32] Rec. Doc. 46, p. 56; Rec. Doc. 37, pp. 4-5.

came upon the scene and advised the two officers of the noise he had heard, at which point the three officers began a canvass of the area and found a pistol on the ground.[33] It was later determined that Ferguson was a convicted felon and that he was on parole with the State of Louisiana.[34] He was therefore arrested for Possession of a Firearm by a Convicted Felon and Resisting an Officer.[35]

On July 31, 2018, Ferguson consented to an interview with agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and signed the ATF's *Miranda* advisements.[36] During the recorded interview, Ferguson made incriminating statements regarding his possession of the gun.[37]

Ultimately, on November 14, 2018, Ferguson was indicted by a federal grand jury on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and a related forfeiture allegation.[38] The instant motion was filed on March 6, 2019.

## Contentions of the Parties

Ferguson frames the issue presented as follows: whether the evidence seized and the statements made by the defendant as a result of his seizure on July 13, 2018, were taken by law enforcement officers in violation of the Fourth Amendment's

---

[33] Rec. Doc. 46, pp. 56-57, 67; Rec. Doc. 45-2, Deft. Ex. 4.
[34] Rec. Doc. 37, p. 5.
[35] Id.
[36] Rec. Doc. 46, pp. 4-5.
[37] Rec. Doc. 46, pp. 4-5.
[38] Rec. Doc. 1.

protections against unlawful search and seizure.[39] Ferguson argues that Cpl. Dupuis's mistaken identification of him was unreasonable, in light of the differences between the physical description of the wanted suspect and the physical appearance of Ferguson. Because the officers lacked reasonable suspicion that Ferguson was the fugitive in question, Ferguson argues that the officers lacked any legal basis to "charge the garage" and, ultimately, seize the defendant. Given that his detention was unconstitutional, Ferguson moves to suppress the firearm seized and statements made, both as fruit of the poisonous tree.

In response, the Government concedes that Ferguson was misidentified as the wanted suspect, Thibeaux, but argues that any misidentification is not relevant to the instant motion.[40] Rather, the Government frames the issue as "whether at the time the defendant discarded the firearm in his possession he had been 'seized' within the meaning of the Fourth Amendment."[41] More specifically, the Government contends that the Supreme Court decision in *California v. Hodari D.,* is on all fours with this case in that Ferguson chose to flee from the moment the officers announced their presence, and therefore, since Ferguson failed to yield to the law enforcement officers' "show of authority,"  he had not yet been seized when he either discarded

---

[39] Rec. Doc. 32-1, p. 1.

[40] *See* Rec. Doc. 37, p. 1 ("During the [surveillance] operations, law enforcement misidentified Dorian Ferguson as Markale Thibeaux.").

[41] Rec. Doc. 37, p. 2.

or abandoned the firearm, which the officers later recovered.[42] Thereafter, the Government contends that the officers were entitled to detain Ferguson, at which point it was determined that he had not lawfully possessed the discarded firearm. Because Ferguson abandoned the firearm prior to his detention, the Government contends that he lacks standing to contest its seizure. Finally, after he was arrested and advised of his *Miranda* rights on two occasions, the Government contends that Ferguson knowingly spoke with law enforcement on both July 13 and 31, 2018, such that there is no basis for suppression of Ferguson's statements.

In reply, Ferguson argues that the Supreme Court's opinion in *California v. Hodari D.*, does not apply to encounters between law enforcement and a fleeing suspect which occur within the curtilage of a private home. Ferguson relies on cases establishing that law enforcement officers' intrusion into a home's curtilage – "the area 'immediately surrounding and associated with the home'"[43] – constitutes a Fourth Amendment search, which is presumptively unreasonable absent a warrant.[44] Because Ferguson was in a garage and therefore "unquestionably in the curtilage of the residence at 314 N. Bienville Street" at the time of the encounter, he argued that an unconstitutional search occurred, and Ferguson's "reaction to flee and the

---

[42] *California v. Hodari D.,* 499 U.S. 621 (1991).
[43] Rec. Doc. 38, p. 3 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))).
[44] Rec. Doc. 38, pp. 2-4 (collecting cases).

subsequent discovery of the firearm are all unlawful fruits of the unconstitutional action."[45]

Without acknowledging in his brief that 314 N. Bienville Street was *not* his own residence, Ferguson then went on to assert that officers did not have reason to believe that *Thibeaux* resided at that address, such that the presence of an arrest warrant for Thibeaux does not excuse the intrusion into the home's curtilage.[46] Assuming, then, that law enforcement officers unconstitutionally intruded into *a* home's curtilage, Ferguson argued that his flight and "loss" of the firearm are tainted and cannot amount to reasonable suspicion.[47] Likewise, Ferguson argued that the unconstitutional curtilage intrusion also distinguishes this case from those involving abandonment. Finally, Ferguson asserted that "[e]ven if *Hodari D.* or the Abandonment Doctrine were found to preclude suppression of the firearm, [his] statements should still be suppressed."[48]

## **Applicable Law and Analysis**

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures.[49] Under the Fourth Amendment, people are guaranteed the right to be secure in their persons, houses, papers, and effects against

---

[45] Rec. Doc. 38, p. 4.
[46] Rec. Doc. 38, p. 4.
[47] Rec. Doc. 38, p. 5.
[48] Rec. Doc. 38, p. 6 (citing *United States v. Duffy*, 796 F. Supp. 1252, 1260 (D. Minn. 1992)).
[49] *United States v. Oliver*, 630 F.3d 397, 405 (5th Cir. 2011); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).

unreasonable searches and seizures, and search warrants are to be issued only upon probable cause.[50] Because the Fourth Amendment itself contains no enforcement mechanism, the exclusionary rule developed as a judicially-created remedy to safeguard Fourth Amendment rights.[51] In general, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure and thereby deters police misconduct.[52] Under the fruit of the poisonous tree doctrine, all evidence derived from an illegal search or seizure must be suppressed unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.[53]

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights."[54] However, warrantless searches are presumptively unreasonable under the Fourth Amendment, such that the

---

[50] *Club Retro, LLC v. Hilton*, 568 F.3d 181, 195 (5th Cir. 2009).

[51] *Davis v. United States,* 564 U.S. 229, 236 (2011).

[52] *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005); see also *Davis*, 564 U.S. at 236-37 ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.")

[53] *United States v. Jones*, 234 F.3d 234, 243-44 (5th Cir. 2000); *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

[54] *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001); *see also United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993); *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992).

Government bears the burden of establishing by a preponderance of the evidence that any such search or seizure was constitutional.[55]

As a threshold matter, Ferguson must have standing to challenge any search. "Fourth amendment rights are individually held and cannot be asserted solely by reference to a particular place."[56] "Whether there is standing to contest the validity of a search 'depends on (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as reasonable.'"[57] "The 'factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.'"[58] "No one circumstance has a decisive 'talismanic'

---

[55] *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999); *United States v. Berick*, 710 F.2d 1035, 1037 (5th Cir. 1983); *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

[56] *United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001) (quoting *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000)).

[57] *Gomez*, 276 F.3d at 697 (quoting *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037-38 (5th Cir. 1990)); *see also United States v. Beene*, 818 F.3d 157, 169 (5th Cir. 2016) ("'[T]he Fourth Amendment protects people, not places' when individuals whose 'expectations of freedom from intrusion are recognized as reasonable.'") (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *Oliver*, 630 F.3d at 405 ("A search occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'") (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

[58] *Gomez*, 276 F.3d at 697-98 (quoting *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. Unit A Jul. 1981)).

significance."[59] "The ultimate [Fourth Amendment] question . . . is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances."[60]

From the outset, Ferguson's motion challenges the reasonableness of the officers' decision to "charge the garage," in light of Cpl. Dupuis mistaking Ferguson for Thibeaux, and their alleged intrusion into the curtilage of the home in doing so. It is well-settled that the Fourth Amendment "has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."[61] Therefore, Cpl. Dupuis' initial observations of the individuals from the street did not violate the Fourth Amendment. Furthermore, there is no evidence that the officers "charged" or "stormed" anything. Rather, the evidence, which this Court finds credible, was that Cpl. Dupuis, accompanied by a uniformed member of the Lafayette City Marshal's office in a marked patrol car, identified themselves as police and gave a command from the middle of a public street to the individuals standing under an open carport to place their hands over their heads. Two complied and those were instructed to approach the perimeter, which was in the public street, where they were questioned and released.

---

[59] *Id*. at 698 (quoting *Haydel*, 649 F.2d at 1155).
[60] *Rakas v. Illinois*, 439 U.S. 128, 152 (1978).
[61] *California v. Ciraolo*, 476 U.S. 207, 213 (1986); *United States v. Dunn*, 481 U.S. 1024, 1141 (1987).

The Court finds that the actions in attempting to identify a potential suspect in an attempted murder by announcing a police presence from a public street along with an instruction to put one's hands over his or her head for safety reasons is not unreasonable.

This Court is not persuaded that the mistake in identity is unreasonable either. Detective LeFort's affidavit contains a description of Thibeaux that is at odds with the photograph contained in the Wanted Poster.[62] The former is a description given by a third party who was the intended victim in the shooting and the latter is from a U.S. Department of Justice poster ostensibly gleaned from a law enforcement database in that Thibeaux had a prior criminal history.[63] The only similarity between the description given by the third party in the affidavit and the poster is that Thibeaux was in his twenties.[64] However, when the information and photographs in the Wanted Poster are compared to the photographs introduced as Gov't. Ex. 2, the Court finds that in the three seconds Cpl. Dupuis observed the individuals in the carport, when combined with the information he had compiled as a result of his

---

[62] Cf. Rec. Doc. 45- 3, p. 1; Deft. Ex 5; Rec. Doc. 44-1, Gov't Ex. 1.

[63] Rec. Doc. 45-3, p. 2; Deft. Ex. 5.

[64] The Court notes that the intended victim picked Thibeaux out of a photographic lineup, however, it is not known if the photograph from which he was identified by the victim was used for the Wanted Poster. See Rec. Doc. 45-3, p. 2; Deft. Ex. 5.

research, it was not unreasonable for him to investigate the possibility that one of the individuals was the fugitive wanted for attempted second degree murder.

For his part, Ferguson chose to flee immediately upon hearing the identity of the police and the instruction to place his hands over his head. The suggestion that he thought he was being robbed in broad daylight under these factual circumstances is not credible. *After* he fled, permission was sought and obtained from the owner of the residence for a search of the house. Thus, the Court finds the actions of the officers were reasonable under the circumstances.

Furthermore, Ferguson has failed to establish that he had a legitimate expectation of privacy that was reasonable under the circumstances during the officers' alleged intrusion into the curtilage of the residence. Applying the relevant *Haydel* factors, it is undisputed that Ferguson did not have an ownership or even possessory interest in the residence at 314 N. Bienville Street. There is no evidence that he had the right to exclude others from 314 N. Bienville Street. He has not claimed and did not, on the date in question, exhibit a subjective expectation that 314 N. Bienville Street would remain free from governmental invasion. And, although he was presumably legitimately on the premises – which does not, in and of itself provide Fourth Amendment protection,[65] there is no indication that Ferguson

---

[65] *See Minnesota v. Carter,* 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but *one who is merely present with the consent of the householder may not*.") (emphasis added).

took normal precautions to maintain his privacy. Essentially, even if "it was a 'home' in which [Ferguson was] present, it was not [*his*] home."[66]

For the same reasons, albeit more compelling, the carport cannot be considered a curtilage to which he would be entitled to Fourth Amendment protection. While this Court might readily find the carport to be the curtilage of the home at 314 N. Bienville were its owners or occupiers raising the issue, the analysis fails when there is a visitor to that location under the facts of this case. There is no dispute the area under the carport was open and could be observed from the street. Nor is there evidence that there were any steps taken by the *resident* to protect the area from observation by people passing by. While the defendant, as a visitor, may want to label the carport as a curtilage to the home of a third party, he cannot, without more, conflate that into a curtilage for which he might enjoy Fourth Amendment protection. The only evidence as to the reason for Ferguson's presence under the carport is his representation in brief that he was there to cut hair, i.e. for a commercial purpose. There was no evidence of any kind as to his relationship, if any, with the residents. He therefore has failed to establish that he had any reasonable expectation of privacy while standing in the open carport, and therefore, lacks standing to challenge the officers' "verbal intrusion" onto the premises of 314 N. Bienville Street.

---

[66] *Carter*, 525 U.S. at 90.

Ferguson suggests the recent case of *Collins v. Virginia*,[67]  creates a "sea change" when it comes to the Fourth Amendment and the principle of curtilage. In *Collins,* the Supreme Court examined the interaction between the automobile exception and the privacy exceptions of the home and held that the automobile exception does not permit "a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein."[68] In *Collins*, a motorcycle parked under a tarp at the "top portion of the driveway that sits behind the front perimeter on the house [and] is enclosed on two sides by a brick wall about the height of a car and on a third side by the house" was searched without a warrant.[69] The Supreme Court, in holding the area was "curtilage", pointed out that it[70] constituted a location "to which the activity of home life extends."

*Collins*, however, has no effect on Ferguson's motion, because the carport was not the carport of *Ferguson's* home.  *Collins* did not disturb long standing precedent that visitors, even those present with the consent of the homeowner, may have no Fourth Amendment protection because they have no expectation of privacy in someone else's home, and by extension, the home's curtilage.[71]  As the Fifth Circuit cogently explained:

---

[67] ___U.S. ___, 138 S.Ct. 1663 (2018).
[68] *Id.,* at 1668.
[69] *Id.,* at 1670.
[70] *Id.,* at 1671.
[71] *Carter*, 525 U.S. at 90; *United States v. Ortiz,* 507 Fed App'x. 339, 341-42 (5th Cir. 2013); *United States v. Phillips* 382 F.3d 489, 495-496 (5th Cir. 2004).

In *Vega,* we observed that the Supreme Court has recognized that "the overnight guest 'typif[ies] those who may claim the protection of the Fourth Amendment in the home of another.' " 221 F.3d at 798 (quoting *Minnesota v. Carter, 525 U.S. 83, 91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)*). By contrast, "[a]t the other end of the spectrum, one merely 'legitimately on the premises' represents the typical individual who may not claim such protection." *Id.* In *Carter,* the Supreme Court concluded on the facts presented that two defendants who were in the apartment of another solely for the purpose of bagging cocaine fell in the latter category, and thus had no reasonable expectation of privacy in that apartment. . . . Applying *Carter* in *Vega,* we concluded that an individual had no reasonable expectation of privacy in the leased home of another where he adduced no evidence that his presence in the home was anything other than commercial (in that case, the distribution of marihuana), "nor did he show that he had ever been to the residence before the day of the raid or that he had any sort of relationship with [the lessee]" prior to the day of the search and seizure. *Vega,* 221 F.3d at 797 (citing *Carter,* 525 U.S. at 90–91, 119 S.Ct. 469).[72]

When the dust has settled, based on the evidence adduced at the hearing, Ferguson attempts to justify exclusion of all the evidence with nothing other than the fact that the "induced flight" he took after the police identified themselves, originated from the curtilage of somebody else's residence, and therefore, *Hodari D.* does not apply. That is an absurd result that this Court does not perceive to be the intent of the Supreme Court in *Collins*.

This Court finds that Ferguson cannot claim the "verbal intrusion" from the street when Cpl. Dupuis identified himself as the police with the instruction for the men standing under the carport to raise their hands, was a constitutional violation

---

[72] *Phillips,* 382 F.3d at 496.

notwithstanding the mistaken identity – which this Court specifically finds was not made in bad faith. Therefore, Ferguson's remaining arguments fail, given that his reply brief relies almost entirely on a finding that the officers' intrusion into the home's curtilage was unconstitutional and thus tainted everything that transpired thereafter. Nonetheless, this Court must determine when Ferguson's Fourth Amendment rights came into play and whether those rights were violated.[73]

"While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the 'very narrow exception' announced in *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may briefly detain a person for investigative purposes if they can point to 'specific and articulable facts' that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime."[74] Whether the facts shown support reasonable suspicion is a question of law.[75] "Although 'reasonable suspicion' is more than a 'mere hunch,' it 'need not rise to the level of probable cause.'"[76] "An 'officer must be able to point to specific and articulable facts which, taken together

---

[73] At the conclusion of its response in opposition, the Government contends that Ferguson also lacks standing to challenge the seizure of the firearm given that he had abandoned same. *See* Rec. Doc. 37, p. 10. While this argument finds some merit in the case law, this Court will proceed with the following analysis, assuming without deciding that Ferguson has standing.

[74] *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).

[75] *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *Oliver*, 630 F.3d at 405.

[76] *Monsivais*, 848 F.3d at 357 (*United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005))).

with rational inferences from those facts, reasonably warrant' an intrusion into the privacy of the detained individual."[77] In determining whether facts support the existence of reasonable suspicion, a court should examine the "totality of the circumstances," in light of the individual officers' training and experience, to determine whether "the detaining officer had a particularized and objective basis for suspecting legal wrongdoing."[78]

"In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and [courts] cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists."[79] "Thus, the determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior."[80] Just because behavior is susceptible of an innocent explanation does not necessarily mean that an officer's suspicion is not reasonable.[81] The conduct constituting reasonable suspicion may even be, by itself, lawful; however, the purpose of a *Terry* stop is "to resolve the ambiguity."[82]

---

[77] *Id*. (quoting *Terry*, 392 U.S. at 21).
[78] *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981))).
[79] *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000).
[80] *Wardlow*, 528 U.S. at 125 (citing *Cortez*, 449 U.S. at 418).
[81] *Wardlow*, 528 U.S. at 125 ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.").
[82] *Wardlow*, 528 U.S. at 125.

As applicable here, in *Illinois v. Wardlow*, the Supreme Court established or confirmed several relevant considerations in determining whether the facts support a finding of reasonable suspicion. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[83] "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[84] Thus, in *Wardlow*, officers "converging on an area known for heavy narcotics trafficking to investigate drug transactions," had reasonable suspicion to stop the defendant, "who looked in the direction of the officers and fled."[85] The Court stated that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."[86]

Here, although this Court agrees with the Government that "the misidentification of Ferguson is immaterial" to the instant motion,[87] it is nevertheless contextually relevant to consider the circumstances by which the officers found themselves at this location. The officers arrived at 314 N. Bienville Street as part of

---

[83] *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).
[84] *Wardlow*, 528 U.S. at 124.
[85] *Wardlow*, 528 U.S. at 121, 122.
[86] *Wardlow*, 528 U.S. at 124.
[87] Rec. Doc. 37, pp. 1-2.

a surveillance operation, in service of a warrant for a potentially dangerous fugitive, on charges of attempted second degree murder and firearm possession. Just as the Supreme Court has found it to be "among the relevant contextual considerations" that a *Terry* stop occurred in a "high crime area," this Court may consider the underlying circumstances of this encounter.[88] Moreover, and most significantly, in response to the law enforcement officers' show of authority, Ferguson engaged in "headlong flight," which is "the consummate act of evasion."[89] Hence, the officers had reasonable suspicion to detain Ferguson.

The next inquiry under the Fourth Amendment analysis is the point at which Ferguson was seized. Ferguson contends that he was detained at the moment the officers "stormed the garage at 314 N. Bienville" (Rec. Doc. 32-1, p. 6). Aside from the fact this Court finds, and the evidence is unrefuted, that at no time was the carport "stormed", the Supreme Court's opinion in *California v. Hodari D.,* belies Ferguson's position. In the factually analogous *Hodari D.* case, the Court held that the defendant, who, upon a showing of authority by officers, attempted to flee, was not seized until he was actually tackled by officers.[90] Thus, the cocaine which the defendant had abandoned while fleeing—prior to his seizure—was not the fruit of

---

[88] *See Wardlow*, 528 U.S. at 124 (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147–148 (1972)).
[89] *Wardlow*, 528 U.S. at 124.
[90] *Hodari D.,* 499 U.S. at 626.

an illegal seizure.[91] The Court held that "[a]n arrest requires *either* physical force ... *or,* where that is absent, *submission* to the assertion of authority."[92]

Ferguson attempted to distinguish *Hodari D.* on the grounds that Ferguson, unlike the defendant in *Hodari D.,* was in a private area, namely the yard of 314 N. Bienville Street. However, for the same reason that Ferguson lacks standing to contest the officers' intrusion onto the property (that he lacks a protectable privacy interest), he cannot escape the result dictated by *Hodari D*.[93] Thus, Ferguson had not yet been seized at the time he abandoned or lost the gun,[94] and no Fourth Amendment violations occurred.

## Conclusion and Recommendation

For the foregoing reasons, it is recommended that the motion to suppress [Rec. Doc. 32], which was filed by the defendant Dorian Arnell Ferguson (01), be DENIED.

---

[91] *United States v. Holloway*, 962 F.2d 451, 456 (5th Cir. 1992), citing *Hodari D., 499 U.S. at 626.*

[92] *Hodari D., 499 U.S. at 626.* (emphasis in original). *U.S. v. Holloway* is another factually similar case in which the officers had reason to suspect the defendant was carrying drugs. Upon blocking Holloway's vehicle, Holloway attempted to flee by backing up. *Holloway*, 962 F.2d at 457-58. The Fifth Circuit held that, as in *Hodari D.,* Holloway had not yet been seized at the time he decided to flee. *Id*.

[93] See *Fontenot v. Cormier*, 56 F.3d 669, 674 (5th Cir. 1995) (Plaintiff in a §1983 action arising out of his arrest, did not have a protectable privacy interest in the public street or in his girlfriend's yard, to which he had fled.

[94] Whether Ferguson abandoned the gun, as the Government contends, or whether he lost it, is irrelevant and this Court makes no finding in that regard given this Court's ruling that Ferguson's Fourth Amendment rights had not yet been triggered.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

Signed at Lafayette, Louisiana on this 26th day of April, 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE